OLMSTEAD, by next friend, *vs.* DUNN *et al.;* DUNN *et al.,* by next friend, *vs.* ROGERS, trustee; DUNN *vs.* ROGERS, trustee, *et al.*

[These cases were argued at the last term, and the decision reserved.]

1. Certain forms are necessary in order for a testator to put down his intention on paper, so that the courts may reasonably be assured that he made and published the paper as his will, such as a certain attestation, signature, etc. But when that assurance is had, and the probate court has pronounced the paper to be the will of the testator, then it is the law of his property (with certain fundamental restrictions), and the question becomes, what did the testator say, and what did he intend by that paper? What he said in it, read in the light of the circumstances surrounding him when he made it, is what he intended to be done with his estate, and therefore what will be done with it.

(*a.*) Each will must be construed for itself, and, in large part, depends upon its own terms and the peculiar circumstances surrounding the testator.

(*b.*) Among the most important surrounding circumstances are the recipients of testator's bounty, their relations to him and associations with him, his uniform affection for them, or any interruption thereof.

2. A vested remainder is one limited to a certain person at a certain time, or upon the happening of a certain event. The law favors the vesting of remainders in all cases of doubt, and in construing wills, words of survivorship will refer to the death of the testator in order to vest remainders, unless a manifest intention to the contrary appears.

3. The fourth item of a testator's will contained the following provision: "It is my will that my executors hold and have my two lots, numbers five and six, Eyles Tything, Heathcote Ward, and also my lot number ten, First Tything, Reynolds Ward, and all improvements thereon, in trust to and for the use of my daughter .

Eliza Waters, for and during the term of her natural life, and after her death to and for the use of her children, if any she shall have, share and share alike; and if she shall have no children living at her death, then in trust to and for the use of my daughters, Jane A. Bruen and Harriet Bryan, for their natural lives, and after their death, then in trust to and for the use of the children of my said daughters, Jane A. Bruen and Harriet Bryan, share and share alike forever."

The fifth item contained the following provision: "It is my will that my executors have and hold my lot number ten, Eyles Tything, Heathcote Ward, forever in trust to and for the use of my daughters, Jane A. Bruen and Harriet Bryan, for and during their lives, and after their respective deaths, then in trust to and for the use of the child or children of my said daughters, Jane A. Bruen and Harriet Bryan, their heirs and assigns forever, share and share alike."

The tenth item contained the following provision: "It is my will that my executors hold and have my railroad stock, in trust to and for the use of my daughter, Eliza Waters, for and during her life, and after her death, then in trust to and for the use of her children, if any she have; and if none, then in trust to and for the use of my daughters, Jane A. Bruen and Harriet Bryan, for and during their lives, and after their deaths, then in trust to and for the use of their issue, share and share alike."

Testator's daughter, Eliza, died childless. Testator had grandchildren living when the will was executed:

*Held,* that the fifth item of the will gave a life estate in common to the two sisters, Jane A. Bruen and Harriet Bryan, with remainder to their child or children; and there being such children *in esse* when the testator died, the remainder then vested, to be enjoyed at the death of the surviving sister, and opened to take in such other children as were not *in esse*, but who came into being up to the time when the enjoyment of the estate was to commence, and all took share and share alike *per capita*.

(*a.*) The fourth and tenth items differed from the fifth only in the fact that the life estate of the two sisters, as well as the fee of their children, was contingent upon the death of Eliza Waters without issue, and the life estate in Jane A. Bruen and Harriet Bryan and the ultimate remainder to the children did not vest until the death of Eliza Waters childless.

(*b.*) This does not conflict with the judgment in 38 *Ga.*, 154, though it may conflict with some of the reasons there stated; and when that case was reversed, it went back for a decree *de novo*.

June 10, 1884.

Wills. Estates. Legacies. Title. Before Judge HAR-
DEN. Chatham Superier Court. March Term, 1883.

Reported in the decision.

DENMARK & ADAMS, for plaintiff in error in first case.

J. R. SAUSSY; CHISHOLM & ERWIN; GARRARD & MEL-
DRIM, for defendants.

CHISHOLM & ERWIN, for plaintiffs in error in second case.

J. R. SAUSSY; DENMARK & ADAMS; GARRARD & MEL-
DRIM, for defendant.

CHISHOLM & ERWIN, for plaintiff in error in third case.

DENMARK & ADAMS; GARRARD & MELDRIM; J. R. SAUSSY,
for defendants.

JACKSON, Chief Justice.

John Waters, on the 14th day of December, 1835, exe-
cuted the following will and codicil:

"In the name of God, Amen:
"I, John Waters, of the city of Savannah, being of sound and dis-
posing mind and memory, but weak in bo'y, do make this my last
will and testament:
"First. I will that all my just debts and funeral expenses be paid.
"Second. I give and bequeath my negroes, Maria, Sandy, William,
Adam and Nelly, to the female asylum of the city of Savannah, on
condition that said corporation exact no service from them, and only
the sum of five dollars from each per annum.
"Third. All the rest and residue of my property, real and personal,
in possession or in action, and all moneys, stocks and debts, I give,
devise and bequeath to my executors, hereinafter named, forever, in
trust to and for the uses hereinafter appointed.
"Fourth. It is my will that my executors hold and have my two lots
numbers five and six (Nos. 5 and 6), Eyles Tything, Heathcote Ward,
and also my lot number ten (No. 10), first Tything, Reynolds Ward,
and all improvements thereon, in trust to and for the use of my
daughter, Eliza Waters, for and during the term of her natural life,
and after her death to and for the use of her children, if any she shall

have, share and share alike, and if she have no children living at her death, then in trust to and for the use of my daughters, Jane A. Bruen and Harriet Bryan, for their respective lives, and after their deaths, then in trust to and for the use of the children of my said daughters, Jane A. Bruen and Harriet Bryan, share and share alike forever. It is my will that my executors, from the residue of my estate, cause to be built a good brick house and out-buildings on the said lot number six, Eyles Tything, Heathcote Ward, as early after my death as may be.

"Fifth. It is my will that my executors have and hold my lot, number ten (No. 10), Eyles Tything, Heathcote Ward, forever in trust to and for the use of my daughters, Jane A. Bruen and Harriet Bryan, for and during their lives, and after their respective deaths, then in trust to and for the use of the child or children of my said daughters, Jane A. Bruen and Harriet Bryan, their heirs and assigns forever, share and share alike. It is my will that my executors, as early after my death as may be, cause to be erected on the said lot number ten a good brick house and out-houses, and that the cost thereof be taken from the residue of my estate.

"Sixth. It is my will that my executors have and hold my lot on Broughton street, number four (No. 4), Liberty Ward, and the improvements thereon, in trust to and for the use of my daughter, Harriet Bryan, for and during her life, and after her death, then in trust for her children, their heirs and assigns, share and share alike.

"Seventh. It is my will that my executors have and hold my lot, number nine (No. 9), Second Tything, Anson Ward, adjoining Doctor Reid's, in trust to and for the use of my daughter, Jane A. Bruen, for and during her life, and after her death, then in trust for her issue, if any she have at her death, and if none, then after her death in trust to and for the use of the children of my other two daughters, their heirs and assigns forever, share and share alike.

"Eighth. I give and bequeath to each of my said daughters two negroes, to be selected by them from my gang, to be held by my executors in trust for them respectively, during their lives, and after their respective deaths to their respective children, if any they have, and if none, then to my grandchildren, share and share alike.

"Ninth. It is my will that my executors sell and dispose of, at public or private sale, my lot, number nineteen (No. 19), Columbia Ward; also my plantations and all other real estate not before disposed of by this will, and all the remainder of my slaves, and that in the case the negroes be sold with the plantation, that they be sold in families. All this I leave to the discretion of my executors.

"Tenth. It is my will that my executors hold and have my railroad stock in trust to and for the use of my daughter, Eliza Waters, for and during her life, and after her death then in trust to and for the use of her children, if any she have, and if none, then in trust to and for the use of my daughters, Jane A. Bruen and Harriet Bryan, for and

during their lives, and after their deaths, then in trust to and for the use of their issue, share and share alike.

"Eleventh. It is my will that my executors invest all the rest and residue of the proceeds of my estate, and all moneys of my estate which shall remain after the payment of my debts and the costs and charges of the improvement before directed to be made on my lots, numbers six and ten (Nos. 6 and 10), Eyles Tything, Heathcote Ward, in bank stock, and that they have and hold the said stock in trust for the equal use and benefit of my daughters aforesaid, during their respective lives, and after their deaths, then in trust for the use of the children of my said daughters, and if either of my daughters die without issue, her share to go to her sisters, and if either die leaving issue, her share to go to her issue.

"Twelfth. I nominate, constitute and appoint my friends, William H. Cuyler, George W. Anderson and William W. Gordon, or such of them as shall qualify on this my will, the executors of this my last will and testament.

"Thirteenth. It is my will that the installments on my railroad stock, which shall hereinafter be called in, be paid by my executors out of the residuum of my estate.

"Fourteenth. It is my will that my lots in town given above to my daughters be never sold by any order of court, consent of parties or in any other manner, but always be held for the trust before named, and in the event of the death or disability of all my executors without representation, the superior court of Chatham county appoint a trustee to carry into effect this will."

A bill was brought against parties defendant claiming an interest in the property bequeathed in the 4th, 5th and 10th items of this will. The facts are undisputed, and the whole case was submitted to the decision of Judge Harden, of the city court of Savannah, the judge of the superior courts of the Eastern circuit being disqualified.

Outside of the will itself, the facts are, that the testator died in 1836, leaving three daughters, Eliza Waters, Jane A. Bruen and Harriet Bryan. Eliza Waters died without issue, having never married, in 1865; Jane A. Bruen died in 1867, having married, and leaving one child; and Harriet Bryan died in 1882, leaving three children, who survived her, to-wit: Florence A. Bryan, Amanda C. Harris and Jane E. Cloud. She gave birth also to a son, John Waters Bryan, who died before his mother, leaving children, however, who survived their grandmother, Harriet Bryan. The child

FEBRUARY TERM, 1884.    855

Olmstead, by next friend, *vs.* Dunn *et al.* ; Dunn *et al*, by next friend, etc.

of Jane A. Bruen, naméd Margaretta, married Alexander
Dunn prior to 1866, who is still living, with two of the
children of Margaretta, who survived their mother.   John
Waters Bryan was living when his grandfather, whose
name he bore, died.   Thus questions are made on these
items of this will—4, 5 an l 10—whether the children of
the two sisters, Mrs. Bruen and Mrs. Bryan, the grandchil-
dren of the testator, at the termination of the life estate
in those sisters, took *per capita* or *per stirpes;* and whether
all of them took, or only those who survived the last tenant
in common of the life estate ; that is to say, who were alive
when Mrs. Bryan died.

Mr. Dunn says that his wife took a vested remainder at
her grandfather's death, and as she was the only child of Mrs.
Bruen, she took one-half of the estate in remainder, the
will intending a division *per stirpes* and not *per capita*,
and by his marital rights attaching when he married her,
he is entitled to one-half.   His children by Mrs. Dunn do
not contest his title, except to say that, if the court thinks
the property theirs, though counsel advise them that it is
not, they are willing to take it.

The children of John Waters Bryan agree with Dunn
that the remainder is a vested remainder, but claim that
the division must be *per capita* and not *per stirpes*, and
hence that Dunn can only take one-fifth of the property,
instead of one-half, which he claims.

The three children of Mrs. Bryan, who survived her, insist
that the remainder did not vest in the grandchildren of
the testator at his death, or at any other time prior to the
death of Mrs. Bryan, but was contingent upon their sur-
vivorship of her, and vested only in those who survived
her, and as they alone survived her, they contend that the
estate in remainder vested in them only then, and of course
that each of them must have a third of it, to the entire
exclusion of their cousin's husband and children and of
their own brother's children.

Every will is a thing to itself.   It is emphatically not
only *sui juris* but *sui generis*.   Its terms are its own law,

and the application of that law by construction of itself—of the statute which the testator himself enacted, to the contestants for its bounty, is the plain duty of the court.

Like variety in the leaves of the forest and the faces of mankind, no two wills scarcely can be found precisely alike. So that every will not only must be construed by itself as containing its own law, but being the only one of its kind, having only its own features, countenance and expression of the mind—the intention that the mind of him who can no more be heard by word of mouth expressed in those features and that face which he put on the paper, it can receive but little help from the expression of other features and faces put on paper differently by other minds. Therefore, only general rules of construction can be laid down in the books to help in ascertaining the true will of any man, how he intended to have his property disposed of at his death. Certain forms are necessary in order that he may so put down his intention on paper that the courts may reasonably be assured that he made and published the paper as his will—such as the number of witnesses, the signature of testator, the attestation of witnesses to it, etc.; but when that assurance is had, and the probate court has pronounced the paper to be his will, then that will is the law of that dead man's property, and what is it, what did he say on that paper is the question; what did he intend by that paper is the problem for every court of construction ; for what he said on that paper, read in the light of the circumstances surrounding him when he made it, is exactly what he intended to be done with his estate, and becomes the legislative will of him whom the supreme power in the state invested with law-making power, so far as his own accumulations during life are concerned, and is thus law as strong as any statute, as high as the constitution itself. We must look, therefore, at the words of the will and the circumstances surrounding this man the year before his death, to see what he wished should become of his property, when he could never more enjoy it himself, but could say, within certain limits of duration

of enjoyment and other fundamental restrictions, who should enjoy it then.

The court below held that he intended that his two daughters, Mrs. Bruen and Mrs. Bryan, should enjoy it during their lives, and at their death it should be divided between his grandchildren, share and share alike, and if an / grandchild should be dead when the last life-tenant expired, and should leave children of their own, then those children should take the share of the dead parent. Did he mean that? It would be quite wonderful if he did not so mean. John Waters Bryan was a living boy when the grandfather made this will. The testator had known and loved this little boy. He prattled often around his knees, and the heart of the man soon to die beat with something of the pleasure of his own boyhood as he watched the gambols of his descendant and his only name-sake. Can it be possible that he intended to disinherit this boy's children, if he lived to manhood and left them, because his mother lived to a great age, and the son died a week before her? If he said so, unquestionably, though unnatural and strange, it is the law; but in ascertaining whether he said so or not—what was his intention in using the words written, the law permits the court to look at that boy and the other little grandchildren alive when he made the will, and if there be any doubt about the expression on the face of the will, to touch the heart of the testator and survey the countenance of the will more closely, and study the expression again, which is always, in all wills, but the mirror of the heart—the reflection of its motive power, its volition, its intention.

I have often thought that the reason why the law required so little sense, mind, reasoning capacity, intellect, to make a will, is because the intention, the heart, the seat of the volition, had so much more to do with it than the cold, calculating intellect, which is brought into play when antagonized by another as cold and calculating in making contracts as itself. It is laid on a corner-stone almost as deep and strong as that on which Omniscience

builds the mansions in the skies for heart-believers to occupy; erected for the occupancy not of those who lay the foundation of belief in the self-sufficiency of an intellect which would argue and contract with its creator and benefactor, but on the longings of a heart which beats for the immortality of goodness, and distrusting the grasp of feeble reasoning powers, "believeth unto righteousness" on the only perfectly good Being who ever inhabited human flesh, and gladly takes as beneficiaries under his will whatsoever his grace gives, asking no questions. Just as the will of Christ came fresh from a heart flowing with love and beneficence, so the will of every testator flows directly from the fountain of the affections; and in construing it, to ignore the heart is to remove the corner-stone and crush the design of the building the testator erected.

Therefore our Code declares that " in the construction of all legacies, the court will seek diligently for the intention of the testator." Code, §2456. And again it declares that " when called upon to construe a will, the court may hear parol evidence of the circumstances surrounding the testator at the time of its execution." Code, §2457.

Among the most important of those surrounding circumstances are the recipients of his bounty, their relations to him and associations with him, his uniform affection for them, or any interruption of the current of that affection; all indicating the direction of the current of his love, his heart-flow towards them.

So in *McGinnis vs. Foster*, 4 *Ga.*, 380, this court cites approvingly this paragraph of the opinion of the court in 9th Leigh, 79, in which Justice Parker said, " I cannot believe the testator meant . . . if all but one of the children died before the mother, for that one to take all, in exclusion of grandchildren and their descendants. This would, I believe, in ninety-nine cases out of a hundred, defeat the intention of the testator. The safest and soundest construction is to consider the estate as vesting at the death of the testator, and not to give the whole to such legatee

as happens to survive the tenant for life, or, if none survive, to declare a total intestacy."

So Lord Mansfield, in the case of Goodtitle *vs.* Whitby, cited with approbation in the case in 6 Wallace, 478, said: " Here, upon the reason of the thing, the infant is the object of the testator's bounty, and the testator does not mean to deprive him of it in any event. Now suppose the object of the testator's bounty marries and dies before his age of twenty-one, leaving children, could the testator intend in such an event to disinherit them ? Certainly he could not."

" Such a construction," says Judge Warner in the case of *Vickers vs. Stone*, 4 *Ga.*, 464, " would be a harsh and unnatural one to give to the will of testators."

Therefore it is seen that as well our court as our statutes would bring us to the consideration of these clauses of this will, looking at the surroundings of the testator, with an eye favorable to such a construction of the terms employed in these items as to divide the property equally among the children, and in case of the death of any before Mrs. Bryan's decease, leaving issue, embracing that issue in the division, in lieu of deceased parents. Of course, if the words of the will make a different construction imperative, we have no option but to give them effect; but if the other construction can be put upon them in accordance with law, it will be a pleasant duty to give effect to that. And, in our judgment, there is no serious difficulty in giving them the latter construction under the rules of law applicable to the facts.

In Fearne on Remainders, the general rule is thus laid down : " Whenever the preceding estate is limited so as to determine on an event which certainly must happen, and the remainder is so limited to a person *in esse*, and ascertained that the preceding estate may by any means determine the expiration of the estate limited in remainder, such remainder is vested." 1 Fearne, 216. So our Code declares, " A vested remainder is one limited to a certain

person at a certain time, or upon the happening of a necessary event." Code, §2265. It also declares in section 2269 that " the law favors the vesting of remainders in all cases of doubt. In construing wills, words of survivorship shall refer to the death of the testator, in order to vest remainders, unless a manifest intention to the contrary appears." See also 4 *Ga.*, 382; 7 *Id.*, 544; 4 Kent, 203; 5 Mass., 535; 4 *Ga.*, 463; 5 Wallace, 287; 6 *Id.*, 475-7, to the same point.

So in 5 Wallace, 288, the rule is thus laid down: " It is the present capacity to take effect in possession, if the precedent estate should determine, which distinguishes a vested from a contingent remainder, when an estate is granted to one for life, and to such of his children as should be living after his death, a present right to the future possession vests at once in such as are living, subject to open and let in after born children, and to be divested as to those who shall die without issue."

And so our Code declares that remainders " may be created for persons not in being, and if a vested remainder, it opens to take in all persons within the description coming into being up to the time of enjoyment commencing." See also 2 Jarman on Wills, 704, note 2.

Now, without going into particular cases analogous more or less to this, let us look at these items of this will and see what they mean, in the light of the general principles above set out.

The fifth item of the will is:

"It is my will that my executors have and hold my lot, number ten (No. 10), Eyles Tything, Heathcote Ward, forever in trust to and for the use of my daughters, Jane A. Bruen and Harriet Bryan, for and during their lives, and after their respective deaths, then in trust to and for the use of the child or children of my said daughters, Jane A. Bruen and Harriet Bryan, their heirs and assigns forever, share and share alike."

It seems to us clear that this item gave a life estate in common to the sisters, remainder over to their child or children, and there being such children *in esse* when the

testator died, the remainder then vested, to be enjoyed at the death of Mrs. Bryan, the surviving sister, and opened to take in such other children as were not *in esse*, and all took share and share alike, *per capita.*

The fourth item is:

"It is my will that my executors hold and have my two lots num·bers five and six (Nos. 5 & 6), Eyles Tything, Heathcote Ward, and also my lot number ten (No. 10), First Tything, Reynolds Ward, and all improvements thereon, in trust to and for the use of my daughter, Eliza Waters, for and during the term of her natural life, and after her death, to and for the use of her children, if any she shall have, share and share alike, and if she have no children living at her death, then in trust to and for the use of my daughters, Jane A. Bruen and Harriet Bryan, for their respective lives, and after their death, then in trust to and for the use of the children of my said daughters, Jane A. Bruen and Harriet Bryan, share and share alike forever."

It is equally clear to us that, with the exception of the bequest to Eliza Waters for life and to her children, should she have any, in remainder, this devise is a counterpart of the fifth item in effect, and must be construed substantially like it.

She, Eliza Waters, had no children; the remaining words then are, "then in trust to and for the use of my daughters, Jane A. Bruen and Harriet Bryan, for their respective lives, and after their deaths, then in trust to and for the use of the children of my said daughters, Jane A. Bruen and Harriet Bryan, share and share alike forever."

The only difference is that, as well the life estate of the two sisters as the fee of their children, was contingent upon the death of Eliza Waters without issue  So that their life estate and the remainder which it supported vested not at the death of the testator, but at the death of Eliza Waters without issue.  The practical effect, however, is the same, inasmuch as Eliza Waters died before the act of 1866, and Dunn's marital rights attached as well on the vesting at her death as they would have attached at testator's death; and as respects the other contestants, it can make no difference either.

The tenth item is like the 4th.   It is as follows :

"It is my will that my executors hold and have my railroad stock in trust to and for the use of my daughter, Eliza Waters, for and during her life, and after her death, then in trust to and for the use of her children, if any she have, and if none, then in trust to and for the use of my daughters, Jane A. Bruen and Harriet Bryan, for and during their lives, and after their deaths, then in trust to and for the use of their issue, share and share alike."

So that, in our opinion, the estate for life and remainder vested here too on the death of Eliza Waters.

The conclusion is that the decree dividing the estate, share and share alike, between Dunn, in right of his wife, and the surviving children of Mrs. Bryan and the heirs of her son, who died before her, each to take one-fifth of the property bequeathed in the 4th, 5th and 10th items of this will, is right, as well as the division of that in the 6th item, which stood by itself, between the children of John Waters Bryan and their three aunts, into four equal parts.

On a careful examination of the judgment in *Dunn vs. Bryan*, 38 *Ga.*, 154, we do not see that it adjudicates any point here decided.   The 11th item of this will is alone there construed, and the struggle was over the life estate, as survivor of Mrs. Bryan, and not the remainder of the children.   She was held by this court not entitled to enjoy a life estate under item 11, and if the contest was abandoned as to the other items here involved 4, 5 and 6, and Judge Fleming's opinion thereon, or rather his judgment thereon stood affirmed, it only affirmed her life estate, and did not affect the remainders.

But when that case in the 38th, *Dunn vs. Bryan*, was reversed, it all went back for a decree *de novo* ; no matter what was argued or abandoned here, and nothing was affirmed unless the remitter so directed.

Our conclusion, therefore, is to affirm the decree rendered by Judge Harden, and reference is hereby called to his very able and learned opinion before he decreed thereon.

Of course, there are *dicta* by Judge Fleming which conflict with the views above expressed, but his judgment as to the life estate is the same as indicated in the views above presented.   On all that he said about contingent remainders here, and that the fee would be only in the children surviving Mrs. Bryan, we differ from him; but in respect to her tenancy for life in the entire property we agree.

So there may be expressions in the opinion of this court, as delivered by Chief Justice Brown, not accordant with what is here decided, but there is no judgment with which we collide.

Judgment affirmed.